J-S30027-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: TERMINATION OF PARENTAL RIGHTS OF S.D. AND W.F., AS TO THE MINOR CHILD A.W.F. | : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.D., NATURAL MOTHER | : | No. 1879 WDA 2017 |

Appeal from the Decree entered November 2, 2017
In the Court of Common Pleas of Elk County
Orphans' Court at No:  3 of 2016

| | | |
|---|---|---|
| IN RE: TERMINATION OF PARENTAL RIGHTS OF S.D. AND R.P., JR., AS TO THE MINOR CHILD C.J.D. | : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.D., NATURAL MOTHER | : | No. 1902 WDA 2017 |

Appeal from the Decree entered October 26, 2017
In the Court of Common Pleas of Elk County
Orphans' Court at No:  No. 4 of 2016

BEFORE:   BENDER, P.J.E., STABILE, J., and STRASSBURGER, J.*

MEMORANDUM BY STABILE, J.:                    **FILED AUGUST 2, 2018**

S.D. ("Mother") appeals from the decrees entered October 26, 2017,

and November 2, 2017, which terminated involuntarily her parental rights to

_____

* Retired Senior Judge assigned to the Superior Court.

her minor sons, C.J.D., born in June 2006, and A.W.F., born in July 2011 (collectively, "the Children").[1]  After careful review, we affirm.

The record reveals that Elk County Children and Youth Services ("CYS") became involved with this family in 2014, after it received reports alleging deplorable living conditions in Mother's home.  N.T., 7/7/16, at 7.  The reports further alleged that drug use was occurring in the home "and that threats were being made" against the Children's older sister, J.E.D.  *Id.*  The trial court adjudicated C.J.D. dependent by order dated March 19, 2014, but did not remove him from the home.  The court did not adjudicate A.W.F. dependent. This situation continued for several months, until CYS obtained custody of the Children pursuant to emergency orders dated September 4, 2014.  The court adjudicated A.W.F. dependent by order dated September 10, 2014.

On January 8, 2016, CYS filed petitions to terminate Mother's parental rights to the Children involuntarily.  The trial court conducted a termination hearing over the course of nearly a year, on March 31, 2016, July 7, 2016, November 10, 2016, and February 1, 2017.[2]  On October 26, 2017, the trial

---

[1] The decrees also terminated the parental rights of R.P., Jr., who is C.J.D.'s father, and W.F., who is A.W.F.'s father.  R.P., Jr., did not appeal the termination of his parental rights.  W.F. filed an appeal at Superior Court docket number 1880 WDA 2017.  We address his appeal in a separate memorandum.

[2] The trial court appointed Thomas G.G. Coppolo, Esquire, to represent the Children during the termination proceedings.  Our review of the record indicates that Attorney Coppolo provided adequate representation of the Children's legal interests during the hearing.  However, we note with

court entered a decree terminating Mother's parental rights as to C.J.D. On November 2, 2017, the court entered a decree terminating Mother's parental rights as to A.W.F.

Mother timely filed a notice of appeal as to A.W.F. on December 1, 2017, along with a concise statement of errors complained of on appeal. That same day, Mother filed a motion to appeal *nunc pro tunc* as to C.J.D. Therein, Mother's counsel averred that Mother contacted his office requesting an appeal on the last day of the appeal period. However, Mother's counsel was out of town, and could not file the notice of appeal on time. The trial court granted Mother's motion on December 6, 2017, giving her until December 15, 2017, to file her notice of appeal. She timely complied by filing a notice of appeal and concise statement on December 13, 2017.

Mother now presents the following questions for our review:

1. Whether the Trial Court erred in terminating Mother's parental rights under 23 Pa[.]C.S.A. §[]2511(a)(1)?

2. Whether the Trial Court erred in terminating Mother's parental rights under 23 Pa[.]C.S.A. §[]2511(a)(2)?

3. Whether the Trial Court erred in terminating Mother's parental rights under 23 Pa[.]C.S.A. §[]2511(a)(5)?

4. Whether the Trial Court erred in terminating Mother's parental rights under 23 Pa[.]C.S.A. §[]2511(a)(8)?

---

disapproval that Attorney Coppolo failed to file a brief advocating for the Children's legal interests on appeal. *See In re Adoption of T.M.L.M.*, 184 A.3d 585, 590 (Pa. Super. 2018) (explaining that counsel's duty to represent a child continues on appeal).

5. Whether the Trial Court committed an error and/or abuse of discretion in finding that the termination of Father's parental rights was in the child's best interest in accordance with 23 Pa[.]C.S.A. §[]2511(b)?

Mother's Brief at 6 (suggested answers omitted).

We review a decree terminating parental rights involuntarily in accordance with the following standard:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S.A. § 2511, governs involuntary termination of parental rights. It requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

- 4 -

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Mother's parental rights pursuant to Section 2511(a)(1), (2), (5), (8), and (b).  We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm.  *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004).  Here, we analyze the court's decision to terminate under Section 2511(a)(8) and (b), which provides as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8) and (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(8):

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) The child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa. Super. 2003). Termination under Section 2511(a)(8) does not require consideration of a parent's willingness or ability to remedy the conditions that led to the removal of his or her child. *In re Adoption of R.J.S.*, 901 A.2d 502, 511 (Pa. Super. 2006).

In its opinions accompanying the termination decrees, the trial court found that the Children have remained in foster care for longer than twelve months, and that the conditions leading to their removal from Mother's care continue to exist. Trial Court Opinion (C.J.D.), 10/26/17, at 10, 16, 18.[3] The court reasoned that Mother failed to comply with services in a timely manner, failed to obtain suitable housing, and failed to maintain a healthy relationship with the Children. *Id.* at 13-16. The court further concluded that terminating Mother's parental rights would best serve the Children's needs and welfare. *Id.* at 17. The court reasoned that there is no evidence that Mother and the Children share a necessary and beneficial bond, and that the Children will not

_____

[3] Because the trial court's discussion is substantively the same for both Children, we cite only the court's opinion as to C.J.D.

suffer irreparable harm. *Id.* at 16-17. The court concluded that the Children's relationship with Mother is, at best, "a primary or basic parental bond . . . that is not secure." *Id.* at 16.

Mother contends that the trial court erred by concluding that her parental rights should be terminated. Mother's Brief at 22-23. Mother asserts that she participated in services, including parenting classes, and maintained a suitable home. *Id.* at 21. She also asserts that terminating her parental rights would be detrimental to the Children, because they remain without a pre-adoptive placement. *Id.* at 22.

Our review of the record supports the trial court's findings. As discussed above, the trial court removed the Children from Mother's care in September 2014. By the time the court terminated Mother's parental rights in October and November 2017, the Children had been removed from Mother's care for over three years, well beyond the twelve months required by Section 2511(a)(8).

In addition, the record is replete with evidence supporting the trial court's findings with respect to the second requirement of Section 2511(a)(8), that the conditions which led to the removal of the Children continue to exist. CYS presented the testimony of caseworker, Carrie Shutters. Ms. Shutters testified that the court ordered Mother to complete several goals. N.T., 3/31/16, at 15-17. Mother's goals included completing a mental health assessment and complying with all recommendations, completing a drug and alcohol assessment and complying with all recommendations, participating in

services to help teach cleaning and organization techniques, completing parenting education classes and demonstrating appropriate parenting skills, and maintaining safe and stable housing. *Id.*

Concerning Mother's compliance with these goals, Ms. Shutters testified that Mother completed mental health and drug and alcohol assessments. *Id.* at 19-21. However, Mother did not comply with the recommendations of the mental health assessment, which included adjusting her dosages of certain medications.[4] *Id.* at 19, 27. Mother failed to complete her cleaning and organization techniques goal, and began but failed to complete parenting classes. *Id.* at 17, 21.[5] Relatedly, Ms. Shutters testified that CYS cancelled eleven of Mother's forty-nine possible visits with Child, because she did not call to confirm or failed to appear. N.T., 7/7/16, at 20. Mother arrived late at fifteen of the visits, and ended one visit early. *Id.*

---

[4] With respect to the drug and alcohol assessment, Ms. Shutters testified on March 31, 2016, that there were not any recommendations for Mother to complete. She stated, "[t]hey were not recommending further treatment because she tested positive for drugs that she was prescribed." N.T., 3/31/16, at 32. However, Ms. Shutters testified on July 7, 2016, that she was unable to ascertain whether the information contained in the assessment was correct, "because [Mother] will not give me the name of her primary care physician nor will she sign a release for me to confirm that information." N.T., 7/7/16, at 9. Ms. Shutters went on to state that the assessment "showed that [Mother] was still taking medications that she was supposed to have weaned off of." *Id.* at 35. Ms. Shutters added that she still needed to confirm whether Mother is prescribed the medications that she tests positive for. *Id.* at 39-40.

[5] Mother testified later, on November 10, 2016, that she did complete parenting classes. N.T., 11/10/16, at 58-59.

Concerning Mother's housing, Ms. Shutters testified that Mother moved twice after Child entered foster care. *Id.* at 10-11. Mother moved into her current home in approximately December 2015. *Id.* at 11. Ms. Shutters reported that she made eleven attempts to visit Mother's home between December 2015 and March 2016 before she was able to see it. *Id.* at 12. She explained,

> I would call and ask if I could come. I would ask them, when they were at visits, if I could come see the house, and I was told repeatedly that I could not come; it was not ready yet. And then they told me on several days that I could come see it the next day, and then they would cancel and say that they weren't going to be home.

*Id.* at 12-13.

When Ms. Shutters finally succeeded in conducting a visit at Mother's home, it appeared to meet "all the standards." *Id.* at 12. However, when Ms. Shutters returned to conduct a surprise visit in May 2016, she discovered that the home was now cluttered, dirty, and unsafe. *Id.* at 12, 16. She recalled, "[t]he pathways were not clear. There was -- were piles of paint chips lying around. . . . there were shoes in the middle. There were boxes. There were just household items scattered around. The kitchen, there were dirty items on the counter." *Id.* at 26.

Thus, it is clear that the conditions leading to the Children's removal from Mother's care remain unresolved. Each of Mother's court-ordered goals related in some way to addressing the concerns and circumstances resulting in the Children's removal. However, Mother failed to complete several of those

goals. To the extent Mother began working toward a particular goal after CYS filed its petition to terminate her parental rights on January 8, 2016, the trial court was not permitted to consider it. *See* 23 Pa.C.S.A. § 2511(b) ("With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.").

Finally, the record supports the trial court's findings with respect to the third requirement of Section 2511(a)(8), that terminating Mother's parental rights would best serve the Children's needs and welfare. CYS presented the testimony of psychologist, Allen H. Ryen, Ph.D. Dr. Ryen testified that he conducted a bonding assessment of the Children and Mother. N.T., 11/10/16, at 6-9. Dr. Ryen opined that the Children have a "primary bond" with Mother, but that it is a "very insecure to perhaps pathological bond." *Id.* at 10. He further opined that terminating Mother's parental rights would not be harmful to the Children, but that he would anticipate "closure and security emanating from that sort of decision." *Id.* at 25.

In his report, Dr. Ryen described interviewing both of the Children. He summarized his interview with C.J.D. as follows:

> [C.J.D.] also described stressful living conditions in the family home, "dogs and dog poop everywhere." He added that "[A.W.F.'s father] **pretty much tortured me**. . . . always had **hand welts** all over my back." [C.J.D.] complained that []he had been arbitrarily grounded for four months, locked in his room, and "we never got enough food." He said he had schemed to jump from

his bedroom window to the roof on a nearby house, then climb down a pole, "and then run away." [C.J.D.] said his mother was "only a little mean," but that she would never take care of them and would never keep her promises, e.g., being allowed to go outside and play with his friends. [C.J.D.] added that "[J.E.D.] was mean too. . . . trying to make us do what Mom said." He said his parents['] problem was that they did "**so much drugs!**" He added that when they were not doing drugs, they were either screaming or sleeping.

[C.J.D.] said he did not like how he was treated by his parents, stating that they never paid attention to him, and that he would usually have to go to them if he needed anything, e.g. a hug. [C.J.D.] said that his parents "always lie. . . . say they love me but I don't believe them. . . . [they] don't treat us right." [C.J.D.] predicted that his parents would "try to hug on us a bunch today to make it look like they're good parents, **but they're not**." [C.J.D.] concluded that he would like to "prove" that they were not good parents, that they're "really, really bad parents," and that "**they shouldn't ever get us back**." He said he was really worried about what his parents would do and say at the bonding assessment, but that the author should be cautious, "because they lie so much."

Dr. Ryen's Report, 5/28/16, at 3-4 (emphasis in original).[6]

With respect to A.W.F., Dr. Ryen wrote that he was equally as critical. A.W.F. described the poor living conditions of Mother's previous home, and stated that she did not take care of him. *Id.* A.W.F. stated that Mother is "bad," and that it would be "really bad" if he had to live with her again. *Id.*

_____

[6] The trial court also heard from C.J.D. in person, who stated that he would not want to live with Mother again, because "I feel like it might be the same thing as before." N.T., 3/31/16, at 118. C.J.D. agreed that he would want to return to Mother's care if she had "a nice clean house with no dogs and it was fun to live there." *Id.* at 122. He further agreed that he would want to return to Mother's care if A.W.F. decided to return, so that he could "know what's happening with" A.W.F. and ensure that he is safe. *Id.* at 121-22.

Dr. Ryen described A.W.F.'s interactions with Mother during the assessment as follows:

> . . . . Eventually [A.W.F.] approached his mother, and allowed her to hold him from behind as he played, but then **ran the truck roughly across her face** in what appeared to be an aggressive or perhaps defensive gesture, and became increasingly more active and demanding, with mock-aggressive defiance. Neither parent was observed to attempt any parenting interventions with any of the children, nor to even attempt to set limits with [A.W.F.] who was becoming increasingly agitated and out of control, for example, repeatedly pulling and tossing his mother's hair. . . .

*Id.* at 5-6 (emphasis in original).

Accordingly, neither of the Children has a positive emotional bond with Mother. As Dr. Ryen's testimony demonstrates, the Children's bond with Mother is insecure, and perhaps pathological. The Children are hostile toward Mother, and do not want to return to her care. Combined with Mother's failure to remedy the conditions leading to the Children's removal, it is clear that preserving her parental rights would be contrary to the Children's needs and welfare.

While Mother is correct that the Children remained without a pre-adoptive placement at the conclusion of the termination hearing, this does not require reversal of the trial court's decrees.[7] A pre-adoptive placement is not necessary for a trial court to terminate parental rights. *See In re Adoption of C.D.R.*, 111 A.3d 1212, 1220 (Pa. Super. 2015) (affirming the termination of parental rights where there was no evidence indicating that the child was

_____

[7] CYS hoped to place the Children with Mother's sister in Texas, who had expressed an interest in adopting them. N.T., 11/10/16, at 30.

bonded with his foster family, or that the foster family was pre-adoptive). Moreover, termination of parental rights may be critical to helping children with unhealthy bonds to their parents find pre-adoptive placements. **_T.S.M._**, 71 A.3d at 268-269 ("Indeed, in some cases, a child's bond with a parent, who has proven incapable of caring for the child, may impede the child's ability to attach to a pre-adoptive family who can provide the needed care and stability."). As a result, we conclude that CYS met its burden of proof with respect to all three requirements of Section 2511(a)(8), and that the court did not abuse its discretion.

We next consider whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(b). We have set forth the requisite analysis as follows:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing

> parent-child bond can be severed without detrimental effects on the child.

*C.D.R.*, 111 A.3d at 1219 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).[8]

As we stated above, the trial court concluded that terminating Mother's parental rights would best serve the Children's needs and welfare. Trial Court Opinion (C.J.D.), 10/26/17, at 17. The court reasoned that there is no evidence that Mother and the Children share a necessary and beneficial bond, and that the Children will not suffer irreparable harm. *Id.* at 16-17.

Mother repeats her previous contention that terminating her parental rights would be detrimental to the Children. Mother's Brief at 24. Mother insists that she and the Children were affectionate during visits, that she attended the Children's various school functions, and that her parenting skills were improving. *Id.* at 24-25.

For the reasons already discussed, the record supports the trial court's findings with respect to Section 2511(b). The Children do not have a necessary and beneficial bond with Mother. The Children's bond with Mother is insecure, and perhaps pathological. It was within the court's discretion to

---

[8] Section 2511(a)(8) and (b) both require trial courts to assess the needs and welfare of the child. However, the needs and welfare analysis required by Section 2511(a)(8) is distinct from the needs and welfare analysis required by Section 2511(b), and must be addressed separately. *See In re C.L.G*., 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*) ("[W]hile both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the 'needs and welfare of the child,' . . . they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).").

conclude that the Children's needs and welfare would best be served by severing this bond, and by allowing the Children to establish new bonds with potential adoptive resources.

Based on the foregoing, we conclude that the trial court did not abuse its discretion by terminating Mother's parental rights to the Children involuntarily. Therefore, we affirm the court's October 26, 2017, and November 2, 2017 decrees.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/2/2018